MERE T. BETHAM, Appellant

v.

FAUMUINA S., Appellee

No. 5-1960

High Court of American Samoa

Civil Jurisdiction, Appellate Division

[Matai Name: "Tuiasosopo" of Vatia]

March 30, 1960

ARTHUR A. MORROW, *Chief Justice;* MALEPEAI, *Associate Judge;* and MALAUULU, *Temporary Associate Judge.*

OPINION AND ORDER OF AFFIRMANCE

Heard at Fagatogo on February 15 and 16, 1960, before Morrow, *Chief Justice;* Malepeai, *Associate Judge;* and Malauulu, *Temporary Associate Judge.*

Fesagaiga and Toso, counsel for Appellant.

Lauvao, counsel for Appellee.

MORROW, *Chief Justice*

This is an appeal from a decree of the Trial Division entered July 2, 1959, ordering the registration of Faumuina S. as the holder of the title Tuiasosopo, attached to the Village of Vatia.

On July 6, 1959, Toso, who had been of counsel for appellant Mere T. Betham (hereinafter referred to as Mere) in the trial court, filed an appeal. Mere, sometime after the hearing and prior to the entry of the decree, had gone to California to attend a summer session of the University of Southern California. Prior to her departure from Tutuila, she left instructions with Penefu, the marshal, to deliver her copy of the opinion and decree in the trial court to her husband, who was to send it to her in California. Penefu delivered the copy to her husband on the day of entry of the decree. Her husband sent it to her. It is noted that she gave instructions that the copy be given to her husband instead of Toso.

Nevertheless Toso, without any express authority from Mrs. Betham, filed an appeal.

It appears that Mere and Toso had a conversation about the case after the trial and before Mere's departure for California. However, it is clear to us that Toso acted without express authority. Shortly after Mere received the copy in California, she consulted a lawyer in Reseda, California. She filed a second appeal, prepared by the California lawyer, on July 17, 1959, which was 15 days after the entry of the original decree. The second appeal was filed without formal notice of appeal as was the first.

The appeals were set down for hearing on February 15, 1960. Sometime prior thereto, appellant moved the

Court to grant a continuance, claiming that it was difficult for her California lawyer to appear in court here at that time. He seems to have had conflicting engagements. This three-judge court overruled the motion for a continuance because the appellant already had local counsel to represent her at the hearing on the appeal. Absence of non-resident counsel because of conflicting engagements is not ground for a continuance when the party is already adequately represented by counsel. See in this connection 12 Am.Jur. 455 and 17 C.J.S. 216.

At the hearing on the motion for continuance, counsel for appellee moved the Court to dismiss both appeals; the appeal filed on July 6 upon the ground that it was filed without authority; the appeal filed on July 17 upon the ground that it was filed too late.

■ The statute requires notice of appeal to be filed "within seven days after the imposition of sentence or entry of the judgment or order appealed from." Section 10, Chapter 5, subchapter E, Section 212, Amendments, Nos. 11–59, to the A. S. Code.

Since the second appeal was filed 17 days after the entry of the order appealed from, and not within seven days as required, the Court dismissed the second appeal.

■ The Court did not rule on the motion to dismiss the first appeal although, doubtless, we might properly have dismissed it upon the ground that it was filed without express authority. See 7 C.J.S. 912 and 5 Am.Jur. 325.

In the appeal filed by Toso, Mere claims that Associate Judges Ape and Tauala, who sat in the trial court, are related to Faumuina. Chief Masaniai of Vatia, who is a member of both the Tuiasosopo Family and the Faumuina Family, and who is familiar with the membership of both families, testified that neither Judge Ape nor Judge Tauala was a member of the Faumuina Family. Faumuina

testified that neither Judge Ape nor Judge Tauala was a member of the Faumuina Family. When John Faumuina, the blood son of the appellee, was recently installed as the holder of the Faumuina title (his father, the appellee, resigned from the Faumuina title after the trial court handed down its decision awarding him the Tuiasosopo title), neither Ape nor Tauala appeared at the ceremony in which he was presented with his sua, nor did either of them present a fine mat. If they had been members of the Faumuina Family, they would normally have been present at the ceremony and presented fine mats in accordance with Samoan customs. There was no evidence whatever presented to the Court giving any indication that Judge Tauala is related to appellee Faumuina. In fact, the only evidence on the issue was to the effect that Judge Tauala is not related to Faumuina. The appellant's claim that Judge Tauala was related to Faumuina was obviously groundless.

■ Appellant claims that Ape is related to Faumuina because Ape's son Maina was once married to a woman who is supposed (presumably after a divorce from Maina) to have married a man related to Faumuina. Nevertheless, assuming it is true (and the evidence was not at all convincing that it is true) that Maina was once married to this woman, all relationship by marriage between her and Maina would terminate upon the divorce. She would no longer be Maina's wife, not being married to him. Certainly if she later married a man related to Faumuina, that man wouldn't be related to Maina since she and Maina were not then husband and wife; and if Maina would not be related to the second husband of his former wife, certainly Maina's father Ape would not be related to that man. That any relationship between Ape and Faumuina could possibly grow out of the foregoing circumstances, if true, (and they were not satisfactorily proved) would be purely imaginary and have no basis in fact. Also, appellant

claims that Ape and Faumuina are related through the Moaaliitele title in Fitiuta. It appears that both Ape and Faumuina signed a petition in 1954 favoring Talalefalealii for the Moaaliitele title. Assuming such to be true, it does not follow at all that Ape and Faumuina are related either by blood or marriage. We know that a man may be adopted into a family or marry into it and sometimes (in the olden days, and even now as far as the law is concerned) become the matai. A descendant of such a matai could very well have no relationship by blood or marriage to descendants of a former holder of the title. By palagi customs, both B and C may be related to A but not related to each other. A may be the great-grandson of B and at the same time also the great-grandson of C, but that does not make B a relative of C. Furthermore, two Samoans may imagine they are related when in fact they are not, and two others may believe that they are not related when in fact they are, both errors growing out of erroneous genealogies handed down by word of mouth. This Court judicially knows that genealogies handed down by word of mouth for a long period (and many of them are handed down for 150 years and more) are many times notoriously inaccurate. In this very case Mere testified that Faumuina was not a member of the Tuiasosopo Family, when the record in the case *Galu of Vatia v. Mariota of Fagatogo*, No. 7-1932 (H.C. of Am. S.) shows quite clearly that Mariota, Mere's blood father, testified that Faumuina of Leloaloa was a matai in the Tuiasosopo Family. Apparently Mere, when trying to get the Tuiasosopo title in this case, was using a genealogy somewhat different from that used by her father Mariota when he was seeking the same title in the above 1932 case. A genealogy in the hands of one member of a family may be an entirely different thing from the same genealogy in the hands of another member of the same family on a different occasion.

We think that the testimony of Masaniai that Ape is not related to Faumuina is to be believed and that it was a true statement of fact. The evidence clearly preponderates in favor of the view that Ape is not related to Faumuina. In view of this and the fact that the only evidence as to whether Tauala was related was to the effect that he was not, we conclude that the first ground of appeal has no merit.

The second ground of appeal is a claim that "Faumuina provided suatai for the Samoan judges openly on the first day of the case and tuuga basket of foods on all the remaining days of the hearing." "Sua" is a short form of "suatai."

The only witness of the appellant Mere to establish this claim was Faagata. Faagata testified that he worked as a stevedore on a ship tied up at the Customs dock during the three days of the hearing and that on the first two days he saw from the ship the alleged suatai being delivered to the Samoan judges Ape and Tauala in the Administration Building, which is at least 250 yards from the dock. Also, there are a number of trees between the Administration Building and the dock through which Faagata must have looked when he saw the supposed delivery of the suatai.

■ According to Samoan customs, a suatai or sua is a very formal presentation of food. First comes a man bearing a coconut and wearing a tapa cloth wrapped about him over his lava lava; next comes another man carrying food on a tray made from a coconut frond; and then a third man follows bearing a roasted pig with a flower in its ear. The coconut, tapa cloth, food, and pig are then presented to the recipient with much formal ceremony.

That Faagata could see 250 yards through trees and know that the so-called sautai came from Faumuina and not one of the three other candidates; that he could see the shucked coconut, the tapa cloth, and a pig on the tray with

a flower in its ear; that he could see two Samoan judges inside the office of the Deputy Clerk and Marshal of the Court and recognize them; see through the walls of the office and see the three persons deliver the suatai to the Samoan judges inside the office is simply incredible. Faagata may have good eyes, but it taxes our credulity to believe he could see through the walls of a building 250 yards away and see three persons deliver a suatai to two Samoan judges in the office.

Appellant Mere filed with the Court an affidavit of Faagata which was obviously prepared in her lawyer's office in California for Faagata to sign in Samoa and which he did sign. That affidavit, which was in English, says that:

"I, Fa'agata, M. of Fagatogo Village, American Samoa, being first sworn, do depose and say that on Monday, May 25, 1959, at about 1:30 o'clock P.M. inside the Administration Building in Fagatogo, saw with my own eyes, chief Faumuina of Leloaloa Village and members of his family, present a Sua to each of the Samoan judges (Tauala and Ape), who sat at the trial of the Tuiasosopo Title in the High Court of American Samoa, Monday, May 25, 1959.

/s/ Fa'agata, M."

As before stated, in his testimony at the hearing on the appeal Faagata swears that he saw the presentation from the ship, while in the affidavit he swears he saw the presentation inside the Administration Building. How he could have seen the same presentation "with his own eyes" at the same time from two different places at least 250 yards apart also taxes our credulity. In his testimony, Faagata said that the suatai was presented at about 12:30 noon. In his affidavit he says it was "about 1:30." The transcript of the proceedings in the trial court shows that the Court recessed at 11:58 A.M., May 25th and reconvened at 1:15 P.M. In other words, the two Samoan judges were on the bench in the courtroom at the very same time

544

that Faagata, while on a ship 250 yards away, recognized them in the Deputy Clerk's office, looked through the walls of the office and saw them receive a suatai, recognized by him as coming from Faumuina. Faagata did not explain to the Court just how he could look through trees at a roasted pig with a flower in its ear from a distance of 250 yards and recognize it as having come from Faumuina.

Not only did Faagata, if we are to believe his testimony, accomplish this truly remarkable feat on the first day of the hearing in the trial court but he did it again on the second day which was May 26th. In view of Faagata's testimony, we think that he was very careless of the truth when he signed the affidavit. However, it was prepared in English in California for him to sign. He is a Samoan, and Samoan is his language. The affidavit has an indorsement on it to the effect that it was translated for him.

It appears from Faagata's testimony that on the third day of the hearing in the trial court he left the ship at noon and came to a poolroom back of the Administration Building and was in the poolroom when he heard a noise; that upon hearing the noise he went to the office of the Deputy Clerk, apparently thinking that he could get some food. When he got there he saw the head of a pig and some leaves of the kind put inside a pig when it is roasted. He said that Judges Ape and Tauala were there. Whether Faagata looked at the pig's head and recognized it as the head of a pig that was once the property of Faumuina, we do not know. However, that may be, he testified that the two Samoan judges indicated to him that it was Faumuina's pig. Faagata testified in this appeal that he was not an aiga of Mere, yet Mere's own testimony before the trial court indicates that she and the said Faagata are related. It is somewhat difficult for us to understand just how Mere could be related to Faagata and at the same time Faagata not be related to her. We note that Faagata was

testifying for Mere. In view of the affidavit of Faagata and his statements on the witness stand, we think we know how much weight to give to his testimony.

Punefu, the Marshal of the Court, who occupies the Deputy Clerk's office along with Poia, the Deputy, testified with respect to the presentation of food. He told the Court that he was in the office and that three baskets (a basket is made from a coconut frond) of food were brought to the office for the office force. It is the custom of Samoans when a feast is had in a village to call out to strangers and present food to them. No doubt the custom grows out of the communal way of life of the Samoan people. Any child in a village is welcome to go into any house in the village and eat. When a matai name case or a land title case is being heard, each of the litigants may have a feast at noon attended by those of his aiga accompanying him to the trial. Quite naturally and pursuant to the customs of the Samoan people, food is presented to strangers or others in the vicinity. Punefu testified, and it was in accordance with the custom, that the three baskets of food were sent by three of the litigants to his and Poia's office for whoever might be there. We think from Punefu's testimony (and we believe him; he was not seeing a pig with a flower in its ear through walls from a distance of 250 yards) that on each of the three days at least three of the litigants each sent a basket of food. Punefu, who received the baskets, did not know which three of the four litigants sent them. As far as he knew, when he got the food for the office, it might have come from Mere, Faumuina, and Gaoteote; from Mere, Gaoteote, and Petelo; from Faumuina, Gaoteote, and Petelo; or from Faumuina, Petelo and Mere. He just knew that it was being presented to the office force and whoever might be there, in accordance with the Samoan custom of providing food for strangers in the vicinity when a feast is had. The fact that Faagata went to the

Deputy Clerk's office from the poolroom on the third day to get some food shows that it was for anybody in the vicinity. There was evidence that Fesagaiga, the Assistant Public Defender, who represents Mere in this appeal, went to the Deputy Clerk's office on one of the days and had some of the food. He had nothing to do with the case in the trial court. He was a stranger in the vicinity when the food was given to Punefu.

■ The judges of this Court are familiar with the Samoan way of life and Samoan customs. This Court takes judicial notice of Samoan customs. They are matters of common knowledge, and courts take judicial notice of matters of common knowledge. 31 C.J.S. 510. We know judicially that the acceptance of such food as was presented here creates no obligation under Samoan customs on the part of the recipient. Section 2 of the A. S. Code recognizes Samoan customs. It provides for the preservation of Samoan customs not in conflict with the laws of the United States applicable in American Samoa or with the laws of American Samoa. This section of the A. S. Code requires this Court to recognize and give effect to valid Samoan customs. The food coming in baskets was not a suatai or a sua. It was just food for anyone who might be in the vicinity. The food was not presented to the Samoan judges. The reliable evidence was to the effect that it was Punefu who received the food. If the two Samoan judges were in the office of the Deputy Clerk when the food was brought in to Punefu and if they consumed part of it, it would, nevertheless create no obligation on their part to the three donors of the food. There was no satisfactory evidence to show that they knew which three of the four litigants sent it. Punefu, who received it, did not know from what three of the four litigants it came. In view of Samoan customs, there was just as much reason for them to believe that Mere sent one of the baskets as that Faumuina sent one. If

547

the Samoan judges were in the office when the food was brought in to Punefu, they could have believed that any three of the four litigants sent it one day and another combination of three on another day and still another combination of three on another day.

The testimony of Punefu (and we regard him as a reliable witness) was that the food was given to him and that it was not presented to the Samoan judges.

Temporary Associate Judge Malauulu asked witness Punefu: "Q Is it the fact then that this sua mentioned by Faagata was not intended for the judges?" to which he replied: "Never been presented for the judges."

Then the witness testified:

"CJ: Was it a sua?

"A There has never been a sua, Your Honor.

"CJ: Well now was this food that was brought to you a sua?

"A Under oath, No, Your Honor.

"CJ: Did it create any obligation on your part toward the parties, that is, under Samoan custom?

"A No, Your Honor. The fact is, Petero himself brought in some food, as I said, which I just recall now. Petero's son brought in some food and still Petero lost the case.

"JUDGE MALEPEAI: Q What is your understanding of this matter, Punefu; was it forced upon the family to present food or was it presented willingly by them in recognition of your participation in this case?

"A I can positively say it is a very understandable thing in Samoa that it was made in consideration of the Samoan customs.

* * *

"CJ: Did the Clerk of the Court receive any food?

"A No.

"CJ: Did I receive any?

"A No, Your Honor.

"FESAGAIGA: Q As an expert witness in this case, Punefu, are you trying to protect the associate judges or are you trying to protect Faagata in your testimony a little while ago?

"A I am bound with my oath, and I am trying to tell the truth and the whole truth and nothing else but the truth. I am not trying to protect anybody."

And Punefu further testified:

"Q Now what is the custom with respect to distributing food when there is no sua, if there are people around when a big feast is being had?

"A Everyone who is around shares the food, Your Honor.

"Q Now I would like to ask you a hypothetical question. Assuming that this food was just brought to the office and it was not a sua and it came from the various parties, and assuming that the judges were given some of it by you, would that create any obligation under Samoan custom on the part of the judges toward any particular party in the case?

"A No, Your Honor. The answer is no."

■ In view of the fact that under Samoan customs no obligation is created by the acceptance of food under the circumstances presented here, it follows that there is no reason to suppose that the Samoan judges had any bias in favor of either Mere or Faumuina or any other candidate who may have furnished food; and this is true even though they may have consumed some of the food which was intended for those in the vicinity. The food was not presented to the Samoan judges, as we have already said.

Samoan culture is entirely different from American culture. It has its roots in human experience going back thousands of years in the Western Pacific under conditions that existed nowhere else in the world. The Samoan way of life is communal.

We think that there is no merit in Mere's second ground of appeal.

The writer of this opinion is fully aware that if the charge made by the appellant with respect to the two Samoan judges were true and if it had occurred in the United States with American judges, it would have been improper there. However, the two Samoan judges sitting with the writer on this appeal (and they constitute a majority of the Court) assure him that, granting for the sake of argument that Samoan Judges Ape and Tauala did

549

consume food under the circumstances claimed by the appellant, they would, nevertheless, under Samoan customs, be under no obligation whatever to the one furnishing the food. The writer concurs with the two Samoan judges sitting on this appeal that under Samoan customs there would be no obligation created. However, he prefers to base his conclusion that there is no merit in the second ground of appeal because of want of satisfactory proof to support the claim of improper conduct by Samoan Judges Ape and Tauala.

The transcript of the proceedings in the trial court shows that at the beginning of the hearing the parties were asked if they had "any objection to any of the judges." Associate Judge Tauala and Ape were on the bench. Mere was the first to answer "No." Faumuina, Gaoteote and Petelo also answered "No." The judges of this Court know Samoans, and they know that that answer of "No" by Mere is a very strong indication that Ape and Tauala are not related to Faumuina, who was opposing Mere for the title. Also when Mere answered "No," being a Samoan, she knew the Samoan customs with respect to food. It appeared from the testimony of Punefu that when Mere's father Tuiasosopo Mariota (and he was a very distinguished Samoan) was counsel in the Tiumalu title case in 1953, food was sent by the parties to the Samoan judges sitting in that case, in accordance with the Samoan customs, they being in the vicinity. And, no doubt, in accordance with the custom it was given to strangers and others who happened to be in the vicinity as well as the judges.

The third ground of appeal is that "We objected to Faumuina during the entire hearing because he has no blood connection to the title and that is why we did not examine his list of signers."

550

The statute (Section 933 of the Code) does not require that the holder of a matai title be a blood member of the family. It provides that "In the trial of matai name cases, the High Court shall be guided by the following in the priority listed: (a) The best hereditary right in which the male and female descendants shall be equal in the family where this has been customary, otherwise, the male descendant shall prevail; (b) The wish of the majority or plurality of the family; (c) The forcefulness, character, personality and capacity for leadership of the candidate; (d) The value of the holder of the matai name to the Government of American Samoa."

The trial division found that Mere had more hereditary right than Faumuina S.; that she had $\frac{1}{2}$ Tuiasosopo blood while he had only $\frac{1}{16}$; and that she prevailed over him on the issue of hereditary right. If the trial court had found that Faumuina had no Tuiasosopo blood at all, its finding that Mere prevailed over him on that issue would necessarily have been the same. Just as $\frac{1}{2}$ is greater than $\frac{1}{16}$, so $\frac{1}{2}$ is greater than zero. There is nothing whatever in the statute requiring a matai to be a blood member of the family. This Court knows judicially that men adopted into the family have become matais of their adoptive families; it also knows that sometimes a married man to the family without any family blood has become the matai of the family.

As long as the trial court found that Mere prevailed over Faumuina on the issue of hereditary right, as it did, she can have no complaint with respect to that issue, even if her contention that Faumuina has no Tuiasosopo blood were true, which, from the evidence before the trial court, we think it is not.

We have gone over the evidence at the trial, and we believe that the weight of evidence favors the view that Faumuina has $\frac{1}{16}$ Tuiasosopo blood. And in reaching this

conclusion we are not considering the fact, as the trial court did not, that Mere's own father in the 1932 Tuiasosopo title case (No. 7-1932, already referred to) testified in effect that Faumuina of Leloaloa was a matai in the Tuiasosopo Family.

Under the applicable statute (Section 10, Chapter 5, Subtitle E, Section 213, Amendments Nos. 11–59 to the A. S. Code) we cannot set aside findings of fact made by the trial court "unless clearly erroneous." The finding of fact that Faumuina has $1/16$ Tuiasosopo blood was not "clearly erroneous." In fact, the finding was well supported by the evidence at the trial.

The fourth ground of appeal is that the Court erred in finding that Faumuina prevailed over Mere on the issue of "Forcefulness, character, personality and capacity for leadership" and on the issue of the "value of the holder of the matai name to the Government of American Samoa."

Counsel Fesagaiga's argument for Mere was that while she does not now have the capacity for leadership, because of lack of experience, to undertake all the duties of the holder of the Tuiasosopo title, yet she will have it in the future and, therefore, she should have the title instead of Faumuina who, according to the evidence before the trial court, has demonstrated his capacity for leadership, whereas Mere has yet to demonstrate her capacity for leadership. The argument is that because of her education she has potential capacity for leadership, which gives her a greater right to the title than the demonstrated leadership of Faumuina gives him. There was no proof that her formal education will make her a leader in the future.

■ We note from the evidence that while Mere is a college graduate, nevertheless, although she became a classroom teacher in the Samoana High School in 1954, she is still a classroom teacher six years later in 1960. She has not been advanced to an assistant principalship or to a

principalship. In other words, she has made no advancement in position in six years, although she may have had some automatic increases in pay as all teachers get because of length of service. If she had the potential capacity for leadership claimed by her counsel, why has she not been advanced to at least an assistant principalship? She is just where she started six years ago. Everybody knows that being a college graduate is no guaranty whatever of capacity for leadership. Some college graduates become leaders, most do not.

According to tradition, the Tuiasosopo should represent his village, his county, and even the Eastern District at most important meetings of Samoans. Mere's counsel, while admitting she does not now have the capacity and the knowledge of Samoan affairs sufficient to enable her to do this, argues, as we have said, that she should have the title in preference to Faumuina (who has already demonstrated his capacity for leadership in many ways) because she has a potential capacity for leadership. He says that other chiefs can perform those village, county and district duties—by tradition those of the Tuiasosopo—for a number of years until Mere can develop her capacity for leadership. We think demonstrated capacity for leadership is to be preferred under the statute to a supposed (but not proved) potential capacity. The fact that in six years Mere has not been advanced in the school in which she teaches from a classroom teacher to a position of more responsibility, such as an assistant principalship, raises substantial doubt as to whether she has the potential capacity for leadership that her counsel claims she has.

The trial court in its opinion said that while Faumuina "does not have the formal education that Mere has, nevertheless he has had years of experience. He has been a matai for 20 years, a bank director for 12 years, a pulenu'u, a village magistrate, a boss over men, a

553

responsible employee of the Navy for 30 years, and he has demonstrated capacity for leadership in his community by leading it in the building of one of the finest schools in American Samoa. Faumuina has built a school while Mere has only taught in one." The evidence before the trial court warranted this statement. We cannot say in the light of the evidence that the finding of fact that Faumuina prevailed over Mere on the issue of "forcefulness, character, personality and capacity for leadership" was clearly erroneous. In fact, we think that the evidence completely supported the finding. Nobody knows whether Mere is a potential leader or not. Maybe she is and maybe she isn't. But we can say that the evidence before the trial court showed that Faumuina had demonstrated his capacity for leadership and that he is a good leader; whereas there was no proof that Mere is now or will be a good leader in the future.

On the issue of capacity for leadership, it is not without significance that only 20 persons out of all the hundreds claiming to be blood members of the Tuiasosopo Family signed Mere's petition to indicate to the trial court that they wished Mere to be the matai of the family and its leader. We have not overlooked the fact that 237 signed for candidate Toso and 18 signed for candidate Tovaki and that when Toso withdrew three days before the trial he attached the petition for himself containing the 237 names and the petition for Tovaki containing the 18 names to the petition for Mere, so as to make it appear that a total of 275 had signed for Mere whereas in fact only 20 had indicated that they wanted Mere to be the matai. Of course we know too that Toso told the trial court that he went to see the 255 signers for himself and Tovaki and that each one of them told him they wanted Mere. However, we also know that it was a physical impossibility for Toso to have interviewed the entire 255 in three days, since they were

scattered over Tutuila and part of Manua, being in the villages of Fagatogo, Pago Pago, Vatia, Amouli, Utulei, Laulii, Matuu, Fagaitua, Auasi, Alao, Alofau, Fitiuta (in Manua), Faganeanea, Atu'u, Satala, Tafagagai, Vaitogi, Nu'uuli, Iliili, Leone and Amanave. It would have taken at least two days for Toso to have gone to Fitiuta, Manua by ship and returned, which would have left only one day to have gone to all the other villages in Tutuila and seen more than 200 different people. If Mere had the capacity for leadership claimed by her counsel in his argument, we think that more than 20 out of the many hundreds of members of the Tuiasosopo Family would have indicated their wish to have her as the leader of the family. Twenty is a very small number in the large Tuiasosopo Family.

 With respect to the issue of value to the Government, we think from the evidence, particularly in view of Faumuina's already demonstrated capacity for leadership, that he will be of more value to the Government of American Samoa as the holder of the matai title Tuiasosopo than would Mere. Certainly we cannot say in the light of the evidence that the finding of the trial court on this issue was "clearly erroneous." This Court has said many times that the value of the holder of a matai title to the Government depends primarily upon his ability to handle the affairs of the family and that that in turn depends upon his forcefulness, character, personality and capacity for leadership. *Faamalolo, et al. v. Liligo Letuli*, No. 25-1956 (H.C. of Am. S.); *I. Malaga, et al. v. Mase Molioo*, No. 4-1957 (H.C. of Am. S.); *Pito Tufono v. Kisi*, No. 17-1958 (H.C. of Am. S.). The evidence, as we have said, did not show that Mere was a leader, nor did it show that she will become a leader. That she may become a leader is pure conjecture.

It is our conclusion, based upon the record in the trial court, together with the testimony adduced at the hearing

of the appeal, that none of the grounds of appeal is meritorious.

Accordingly, it is ORDERED that the decree of the trial court be and it is affirmed.

Costs in the sum of $37.50 are hereby assessed against Mere T. Betham, the same to be paid within 30 days.